IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

YOLANDA MINGO                                                      PLAINTIFF

v.                                        CIVIL ACTION NO. 2:14cv67-KS-MTP

CAROLYN W. COLVIN                                                  DEFENDANT

## REPORT AND RECOMMENDATIONS

Plaintiff Yolanda Mingo ("Mingo") brings this action pursuant to 42 U.S.C. § 405(g), and seeks judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for social security disability insurance benefits.  The matter is now before the Court on Defendant's Motion [14] to Affirm the Decision of the Commissioner. Having considered the pleadings, the record and the applicable law, the undersigned recommends that the Motion [14] be GRANTED.

## PROCEDURAL HISTORY

On January 18, 2011, Plaintiff Yolanda Mingo filed an application for a period of disability and disability insurance benefits, alleging a disability onset date of May 8, 2010. (Administrative Record [9] at 138.)[1] This application was denied initially and upon reconsideration. ([9] at 101; 106.) Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). ([9] at 109.)

On November 6, 2012, a hearing was convened before ALJ Wallace E. Weakley. ([9] at 27.) Plaintiff waived her right to representation by an attorney. ([9] at 137.) The ALJ heard testimony from the Plaintiff and vocational expert  ("VE") Tom Steward. ([9] at  35; 55.) On February 20,

---

[1]For ease of reference and pursuant to the Court's Order [3] directing filing of briefs, the administrative record is cited to herein by reference to the Court's docket number and docket page number in the federal court record and not the Administrative Record page number.

2013, the ALJ issued a finding that Plaintiff was not disabled. ([9] at 9-22.) Plaintiff appealed this

decision and submitted additional evidence to the Appeals Council.[2] ([9] at 8.) The Appeals Council

denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the

Commissioner. ([9] at 4-8.)

Plaintiff filed her Complaint on May 15, 2014, requesting an order from this Court reversing

the Commissioner's final decision and directing the Commissioner to award benefits to the Plaintiff,

or in the alternative, remand the case for hearing held in accordance with the requirements of the

Social Security Act, Administrative Procedure Act, and the United States Constitution. *See*

Complaint [1] at 5. Plaintiff also requests the Court to award her attorney's fees and the costs and

fees of this action. *Id.* The Commissioner answered the Complaint, denying that Plaintiff is entitled

to any relief, *see* Answer [8], and filed a Motion [14] to affirm the Commissioner's decision. The

parties having briefed the issues in this matter pursuant to the Court's Scheduling Order [3], the

matter is now ripe for decision.

## MEDICAL/FACTUAL HISTORY

Plaintiff was forty years old at the time her alleged disability onset date. ([9] at 138.) Plaintiff

completed high school and attended college for a short period of time. ([9] at 36-37.) She has work

experience as a teacher's assistant and assembly line worker. ([9] at 37-39; 160.)  In her disability

report, Plaintiff alleged that she had been unable to work since May 8, 2010 – the date she was

involved in a motor vehicle accident. Plaintiff alleged that she suffers from the following conditions:

neck injury, back injury, deep vein thrombosis ("DVT"), thyroid nodules, right kidney cysts,

---

[2]Additional evidence was presented to the appeals council, and consisted  of a supporting
brief and additional medical records. ([9] at 8.)

medical collateral ligament ("MCL") strain and quad strain, enlarged lymph nodes in chest, abnormal EKG, and chest pain. ([9] at 159).[3]

The administrative record in this case contains voluminous medical documents from various providers. While these records reference multiple medical issues of the Plaintiff, the undersigned will outline only those records pertaining to the conditions the Plaintiff argues should have met or equaled a listed impairment.

Plaintiff was seen at Forrest General Hospital on May 8, 2010, following a motor vehicle collision. Her admittance records reflect that Plaintiff was wearing her seat belt and sitting in the rear seat when the car was struck from behind by another vehicle. She complained of pain in her neck, lower back and right groin. Dr. Joseph J. Patterson noted that Plaintiff's neck was "supple with paracervical and trapezius muscle tenderness." ([9] at 222.) Dr. Patterson also examined Plaintiff's groin and extremities and noted no evidence of bruising, swelling, or injury. He noted that a CT of Plaintiff's head was negative, and a CT of her cervical spine showed no fracture. He diagnosed Plaintiff with neck and back strain. ([9] at 223.)

On May 10, 2010, Plaintiff returned to the emergency room, complaining of right leg pain and swelling. An ultrasound of Plaintiff's leg was performed to exclude DVT, with normal results.

---

[3]The record reflects that at the time of the ALJ hearing, Plaintiff was five feet four inches tall and weighed 227 pounds. In his opinion, the ALJ noted that these values yield a body mass index of 39.0, with anything thirty or over representing obesity. The Plaintiff did not list obesity as an impairment on her initial disability application, although it was at issue at the hearing and is discussed extensively in the ALJ opinion. The ALJ found that while the Plaintiff's obesity constituted an "severe" impairment, the combined impact of Plaintiff's impairments, including obesity, singly or in combination, did not meet or medically equal the criteria for any listed impairment. *See* discussion *infra*. The Plaintiff does not argue that the ALJ erred in his evaluation of this condition in her Complaint [1] or supporting Brief [12], and the undersigned will not address it here.

Plaintiff was diagnosed with right leg pain of uncertain etiology, and was instructed to have another ultrasound of the right leg within two or three days. ([9] at 225.)

On May 12, 2010, Plaintiff returned once more to the emergency room at Forrest General, after having tested positive for DVT at her primary care physician's office. A new ultrasound showed a small amount of DVT in the proximal greater saphenous vein as well as nonocclusive thrombus extending from the common femoral vein down to the popliteal vein. Plaintiff was immediately given Arixtra[4] and Coumadin.[5]  Routine blood tests were taken and Plaintiff was admitted as a patient. ([9] at 226-27.) Plaintiff was discharged from Forrest General on May 14, 2010, with a diagnosis of DVT and secondary diagnosis of neck and back pain. She was directed to remain on medication for several days, but was in stable condition. ([9] at 220.)

Plaintiff saw orthopedist Dr. Vance M. McKaller at the Walk-In Spine Center on May 17, 2010.  Dr. McKellar noted that Plaintiff had mild tenderness in the paracervical muscles, the parascapular area, the mid-thoracic region and lower back area. However, Dr. McKallar also noted that there was no evidence of weakness or myelopathy, and that Plaintiff had a good range of motion. He stated that Plaintiff's x-rays showed no evidence of fracture or osseous abnormality. Dr. McKallar opined that Plaintiff likely had  cervical strain, whiplash, thoracic/back contusions and a muscle spasm, but that with time and medication, he thought she would "continue to improve." ([9] at 242.)

---

[4]Arixtra is anticoagulant or "blood thinner." *See* Arixtra, United States Food and Drug Administration,  http://www.accessdata.fda.gov/drugsatfda_docs/label/2005/021345s010lbl.pdf (Last Visited on May 28, 2015).

[5]Coumadin is also an anticoagulant. *See* Coumadin, United States Food and Drug Administration, http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088578.pdf (Last Visited May 28, 2015).

On May 24, 2010, Plaintiff returned to the Forrest General emergency room.  Plaintiff had undergone a PT/INR[6] test at the Hattiesburg Clinic that day, and was told that her results were abnormal. Except for the high INR, Plaintiff denied all complaints. She was admitted to the hospital in order to monitor her INR levels.  Her medications were adjusted and she was given plasma. ([9] at 218-19.) By the next day, Plaintiff's INR levels were normal and she was discharged. Dr. Catherine Charel Graversen noted that Plaintiff's right leg remained  swollen due to the DVT, but stated that "this will be a long-term issue and will take quite some time to resolve." ([9] at 217.)

At an appointment at the Hattiesburg Clinic on June 8, 2010, Dr. Mark Stevens noted that Plaintiff was "cheerful, cooperative and in no distress." His examination showed that Plaintiff had no back tenderness and no edema in her extremities. ([9] at 344-45.)

On June 21, 2010, Plaintiff had a follow-up ultrasound of her right lower extremity that showed no evidence of DVT. ([9] at 236-37.)

Plaintiff had another appointment with her orthopedist on July 15, 2010. Dr. McKellar noted that Plaintiff still had some neck pain and right knee pain, but that there was no evidence of weakness or myelopathy. He recommended that she continue to take anti-inflammatory medication and prescribed her a muscle relaxer. ([9] at 241.)

On July 30, 2010, Plaintiff visited the Hattiesburg Clinic complaining of knee pain. Nurse Practitioner Billy Windham noted that Plaintiff had acute to modest tenderness along the joints in her knee, but that x-rays failed to reveal any bone injury. Furthermore, Dr. Steven Cunningham

---

[6]The prothrombin time (PT) and international normalized ration (INR) are measures of the extrinsic pathway of coagulation. The test is used to monitor the effectiveness of the anticoagulant Coumadin. *See* PT and INR, Lab Tests Online, http://labtestsonline.org/understanding/analytes/pt/tab/test/ (Last visited May 27, 2015).

examined Plaintiff's x-rays and opined that "[t]he osseous structures are normal and joint spaces are well maintained. No fractures, dislocation, or destructive lesions are seen. The overlying soft tissues are normal." Windham diagnosed Plaintiff with a MCL strain and fitted her with a hinged knee brace. He also recommended that Plaintiff attend physical therapy. ([9] at 338-40.)

On September 14, 2010, Plaintiff went to the Hattiesburg clinic for an MRI of her lumbosacral spine, cervical spine and right knee. The MRI of her lumbosacral spine showed a slight desiccation[7] without loss of disc height at the L5-S1 level, but was otherwise unremarkable. The desiccation was described as a "minor degenerative change[]." ([9] at 448-49.) The MRI of her cervical spine initially showed degenerative changes at C5-C6, but a follow-up MRI showed only a slight straightening of the normal cervical lordosis[8] and was otherwise unremarkable. ([9] at 450-51.) Plaintiff's results were later reviewed and she was diagnosed with cervicalgia[9] and lumbago.[10] ([9] at 443.)

As mentioned above, Plaintiff also had an MRI of on her right knee. Nurse Practitioner Billy Windham noted that Plaintiff had modest tenderness over her knee, but that she had no pain along

---

[7]Desiccation is a common degenerative change of the vertebrae in which there is a loss of fluid between the intervertebral discs. *See* Degenerative Disc Disease, UCLA Neurosurgery, http://neurosurgery.ucla.edu/body.cfm?id=1123&ref=111&action=detail (Last Visited May 28, 2015).

[8]Cervical lordosis is the natural curve in the area of the spine which contains the neck vertebrae. *See* Understanding Lordosis, http://www.scoliosis.org/resources/medicalupdates/lordosis.php (Last Visited May 28, 2015).

[9]Cervicalgia is neck pain that occurs toward the rear or the side of the cervical vertebrae. *See* Cervicalgia Symptoms and Treatment, Southeastern Spine Institute, http://www.southeasternspine.com/spinal-procedures-treatments/spinal-anatomy-and-conditions/cervicalgia/ (Last Visited May 28, 2015).

[10] Lumbago is defined as lower back pain. *See* Back Pain, MedlinePlus, http://www.nlm.nih.gov/medlineplus/backpain.html (Last Visited May 28, 2015).

the medial or lateral joint line or LCL. She also demonstrated full flexion and extension of the knee. Dr. Juan Velez reviewed her MRI, which he found to be unremarkable. ([9] at 447.)

On November 10, 2010, Plaintiff's right knee was examined by Nurse Practitioner Windham at the Hattiesburg Clinic. Plaintiff stated that physical therapy had been "very beneficial for her" and that she was "pleased with her progress." Windham's examination of Plaintiff's knee revealed that she had only "very modest tenderness over the MCL." She had no erythema or swelling, and demonstrated full flexion and extension of her knee. Windham opined that Plaintiff's condition had improved and recommended that she continue with therapy. ([9] at 427.)

Plaintiff went to an appointment at the Hattiesburg Clinic on November 16, 2010, in regard to her previous DVT diagnosis. Plaintiff claimed that she still had some soreness, but Dr. Thomas S. Messer found that Plaintiff had no edema, and that an ultrasound revealed no blood clots. Dr. Messer opined that Plaintiff's DVT had resolved, but suggested that she continue taking Coumadin for another six months. ([9] at 425-26.)

On November 19, 2010, Plaintiff visited Marion General Hospital complaining of neck and upper back pain, as well as pain in her right thigh. An examination of her extremities showed no clubbing, cyanosis or edema. Plaintiff was told to continue her current medications and come back for a follow-up appointment. ([9] at 271.)

Plaintiff's records reflect that she completed five weeks of physical therapy for her right knee. At an examination on December 29, 2010, Plaintiff showed a full range of motion in the cervical and lumbar spine. No clubbing, cyanosis or edema was noted in her extremities. She had a steady stance and normal gait, and her MRIs were normal. Nurse Jessica Thomas and Plaintiff

discussed a possible referral to the psychiatry department for trigger point injections[11] due to lingering pain in her back and neck. Thomas noted that she "really d[id] not have anything else to offer [the Plaintiff] at this point." ([9] at 413.)

Dr. Barbara S. Barnard examined Plaintiff on February 22, 2011. Plaintiff's chief complaint was neck and back pain. Dr. Barnard noted that Plaintiff's MRIs were normal, and stated that the Plaintiff's gait was tandem, her heel and toe walking intact, and her range of motion was within functional limits. She had full strength in her upper and lower extremities. Dr. Barnard diagnosed Plaintiff with myofascial pain[12] and gave her trigger point injections. ([9] at 407-09.)

On April 11, 2011, Plaintiff returned to the Hattiesburg Clinic and was examined by Dr. Barnard. Plaintiff stated that the trigger point injections did not help her pain, but nonetheless requested another treatment. Dr. Barnard stated that she was "just not comfortable injecting her" due to the fact that the injections did not help the first time. She also noted that an MRI of Plaintiff's neck was "completely normal," and that Plaintiff denied any back pain. Dr. Barnard recommended that Plaintiff exercise regularly and attempt to get off her pain medication. She also ordered another x-ray of Plaintiff's thoracic spine, which showed normal alignment with no fracture or subluxation. Some mild degenerative changes were noted, but there was no significant focal disc space

---

[11]Trigger point injections consist of a doctor inserting a fine needle through the skin into a "trigger point area," which are painful areas of muscle that are tender and may feel like tight bands or knots when pressed. The doctor then moves the needle gently in and out of the trigger point area to relieve tension in the muscle. *See* Trigger Point Injections, UW Health, https://www.uwhealth.org/healthfacts/pain/6370.html (Last Visited May 28, 2015).

[12]Myofascial pain syndrome is a chronic pain disorder in which pressure on sensitive points in one's muscles causes pain in seemingly unrelated parts of the body. *See* Myofascial pain syndrome, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195 (Last Visited May 28, 2015).

narrowing. The radiologist opined that Plaintiff had "only very mild degenerative changes with no acute finding." ([9] at 389-90.)

Also on April 11, 2011, State agency consultant Dr. Madena Gibson reviewed the record evidence and completed a Physical Residual Functional Capacity Assessment. Dr. Gibson determined that Plaintiff could occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, and could stand, walk and sit for about six hours in an eight-hour workday. She opined that Plaintiff could push and/or pull without limitation. Dr. Gibson then outlined the evidence supporting these conclusions, citing Plaintiff's neck and back pain and DVT diagnosis, but noting that the Plaintiff had no edema and had a steady stand and gait. ([9] at 358-59.) Dr. Gibson also opined that Plaintiff could climb, stoop, kneel and crawl occasionally. She determined that no manipulative, visual, or communicative limitations had been established, but that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. ([9] at 360-63.)

Plaintiff received an MRI of her thoracic spine on April 23, 2011. Dr. Geoffrey Hartwig opined that the MRI reflected abnormalities in the T11-T12 level and a ten percent wedge deformity at the T8 level. However, at a June 6, 2011 appointment, Dr. Barnard noted that it was hard for her "to even appreciate" that interpretation and that the MRI was otherwise normal. Dr. Barnard also examined Plaintiff's September 2010 MRI of her lumbar spine, and agreed that there was mild degenerate disc disease in the L5-S1 region. Dr. Barnard noted that Plaintiff was in no distress and had a normal tandem gait, as well as full strength in all extremities. Plaintiff had increased back pain upon extending and bending to the right side. ([9] at 365-66.)

Dr. Kevin Holmes completed a "Statement of Examining Physician" in regard to the Plaintiff sometime in September 2011. The handwriting on the document is barely legible, but appears to

state moderate lumbago as Plaintiff's principle diagnosis, with moderate cervicalgia as a secondary diagnosis. The Plaintiff's restrictions include "no stooping[,] lifting or bending." Much of the remainder of the document is illegible. ([9] at 529.)

On October 5, 2011, Dr. Barbara Barnard completed a "Statement of Examining Physician." Dr. Barnard opined that Plaintiff had "mild DDD[13] of the lumbar spine," with a secondary diagnosis of "thoracic pain and low back pain." Dr. Bernard noted that Plaintiff's restrictions included "no heavy lifting, pulling, pushing, no stooping, kneeling, crawling, climbing, twisting, bending, reaching overhead. Worsening pain with any type of activity, walking, standing and prolonged sitting." ([9] at 486.)

On January 9, 2012, Plaintiff was examined by Dr. Kevin Holmes. Dr. Holmes noted that Plaintiff presented with neck and back pain, but that her musculoskeletal system was functioning normally. He recommended light exercise and that Plaintiff continue her medications. ([9] at 497-99.) At a follow-up visit on April 9, 2012, Dr. Holmes reiterated Plaintiff's complaints of neck and back pain, and in addition, noted that she presented with pain in her right knee. Dr. Holmes noted that Plaintiff denied swelling or muscle weakness/pain, and described the complaints as "moderate." Dr. Holmes noted that a consult with a rheumatologist might be preferable to evaluate whether Plaintiff suffered from fibromyalgia. ([9] at 494-96.) Dr. Holmes made similar notes at an appointment with the Plaintiff on August 13, 2015, but made a brief mention of Plaintiff's other "pertinent medical conditions," which included arthritis and fibromyalgia. Dr. Holmes provided no further explanation of these conditions. He stated that these symptoms "moderately limit[ed] activities" in the Plaintiff's life, and that her knee pain was "alleviated by non weight bearing." ([9]

---

[13]"DDD" is a common abbreviation for "degenerative disc disease."

at 522-23.)

Plaintiff visited rheumatologist Dr. David Weiss on September 25, 2012. Dr. Weiss noted that the Plaintiff had "diffuse and very prominent myofasical trigger points." Dr. Weiss also noted "some decrease in cervical spine range without parapsinal tenderness. There was fair range of motion [of the] lumbar spine, no paraspinal tenderness." He opined that Plaintiff suffered from "chronic neck and low back pain occurring in the setting of multiple hallmark features of fibromyalgia and also mild elevations of acute phase reactants."[14] Dr. Weiss ordered no tests, nor reviewed any of Plaintiff's past MRIs or lab results. Dr. Weiss made recommendations for medication, but did not prescribe the Plaintiff any medication. He also recommended that she attend a follow-up appointment in one or two months. ([9] at 500-01.)

On October 19, 2012, Plaintiff went to the Forrest General Emergency Room complaining of chest and back pain. Dr. Brian Archer ordered an ultrasound of Plaintiff's leg, which was negative for DVT. Plaintiff was discharged the same day. ([9] at 502-03.)

**BURDEN OF PROOF**

In *Harrell v. Bowen*, the Fifth Circuit detailed the shifting burden of proof that applies to disability determinations:

> An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act. Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled. In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step

---

[14]Acute phase reactions are defined as the varied bodily reactions to infection, inflammation or trauma. *See* Acute-phase proteins: As diagnostic tool, United States National Library of Medicine, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3053509/ (Last Visited May 28, 2015).

sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.  An individual who does not have a 'severe impairment' will not be found to be disabled.

3.  An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

862 F.2d 471, 475 (5th Cir. 1988).  The claimant bears the burden at the first four steps, but the burden thereafter shifts to the Commissioner at step five. Once the Commissioner makes the requisite showing at step five, the burden shifts back to the claimant to rebut this finding.  *Perez v. Barnhart,* 415 F.3d 457, 461 (5th Cir. 2005).  A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis."  *Harrell,* 862 F.2d at 475 (citations omitted).

## ADMINISTRATIVE LAW JUDGE'S ANALYSIS

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.  At step one of the evaluation,[15] the ALJ found that Plaintiff had not engaged in substantial gainful employment since May 8, 2010, the alleged onset date. At step two, the ALJ found that Plaintiff suffered from the following severe impairments:

---

[15]The ALJ applied the evaluation process set forth in 20 C.F.R. §§ 404.1520(b)-(f) and 416.92(a).

12

obesity, history of deep vein thrombosis, neck and back pain, cervicalgia, lumbago, and disc bulge at L5-S1. ([9] at 14.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Part 4, Subpart P, Appendix 1. ([9] at 15-16.) In order to make a determination at step four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC").[16] The ALJ found that:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[17] except that the claimant requires a sit/stand option. The claimant can sit for up to thirty minutes at a time and she can stand up to twenty minutes at a time. She must be able to change positions at will. She would require limited walking, a maximum of three hundred feet at a time. She can stand, sit and walk for a total of eight hours a day. She can do no reaching above head height. She cannot stoop and she can occasionally bend and kneel. She cannot climb ladders, ropes or scaffolds. In formulating this opinion, the undersigned relied on the record evidence as a whole (Exhibit A through F) along with the testimony provided at the hearing.

([9] at 16.)

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work as

---

[16]"Residual Functional Capacity" is defined in the Regulations as the most an individual can still do despite the physical and/or mental limitations that affect what the individual can do in a work setting. 20 C.F.R. § 416.945.

[17]

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b)

13

a teacher's aide, a wire harness assembler, or an order sorter because the exertion demands of her past work exceed her RFC. ([9] at 21.) Finally, at step five, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. The ALJ based this conclusion on Plaintiff's age, education, work experience and RFC. These jobs include booth cashier, a gate guard, and a storage rental clerk. Accordingly, the ALJ found that Plaintiff was not disabled. ([9] at 21-22.)

## APPEALS COUNCIL REVIEW

As outlined above, Plaintiff appealed the ALJ's decision and submitted additional evidence to the Appeals Council that was not before the ALJ.[18] Specifically, Plaintiff submitted a brief from her newly hired attorney as well as additional medical records. ([9] at 8.)

The additional medical records consist an additional treating physician opinion of Dr. Kevin Holmes and notes from consulting physician David Weiss.  ([9] at 521-37.)[19] In the "Attending Physician's Statement," Dr. Holmes opined that Plaintiff's diagnosis included "LS pain." He checked the "yes" box next to the question, "Is the patient now totally disabled?" Dr. Holmes also checked the "yes" box next to the question, "Has there been any improvement in functional status since last report?" The remainder of the document is either blank or illegible. ([9] at 530.)

There are also two sets of clinical notes signed by Dr. Davis Weiss, a consulting physician specializing in rheumatology ([9] at 531-536.) The first set of notes indicates that Dr. Weiss saw the Plaintiff on January 17, 2013. He noted that she had begun taking the medication he suggested at

---

[18]20 C.F.R. § 404.970(b) permits a claimant to submit new evidence to the Appeals Council.

[19]The exhibits contained other medical documents that were already submitted and made part of the record considered by the ALJ. Therefore, the undersigned sees no need to outline these documents a second time.

her last visit, but stated that it "did not provide much benefit[]." Dr. Weiss opined that Plaintiff

suffered from "active fibromyalgia," but he also opined that he had a "low suspicion for connective

tissue disease or inflammatory arthropathy." Dr. Weiss recommended different medication and

suggested that the Plaintiff try neck and lower back strengthening and conditioning exercises. ([9]

at 531-32.)

Plaintiff had another appointment with Dr. Weiss on March 21, 2013. He noted that she had

a decreased range of motion in her cervical spine and tenderness in the paracervical muscle groups.

Dr. Weiss recommended increasing the dosage of Plaintiff's medications. ([9] at 533-34.)[20]

The Appeals Council noted the additional records submitted by the Plaintiff, but denied her

request for review, stating:

> We have found no reason under our rules to review the Administrative Law Judge's
> decision. Therefore, we have denied your request for review . . . In looking at your
> case, we considered the reasons you disagree with the decision and the additional
> evidence on the enclosed Order of Appeals Council. We considered whether the
> Administrative Law Judge's action, findings, or conclusion is contrary to the weight
> of the evidence of record. We found that this information does not provide a basis
> for changes the Administrative Law Judge's decision.

([9] at 4-5.)

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to inquiry into whether there

is substantial evidence to support the Commissioner's findings and whether the correct legal

standards were applied in evaluating the evidence. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir.

1988). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant

---

[20]The other additional document submitted to the Appeals Council was the brief of
Plaintiff's representatives, which the undersigned notes is substantially similar to the brief
submitted in the instant action. *Compare* ([9] at 209-211) *with* Appellant's Brief [12].

evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983). To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Id.* at 164 (citations omitted). However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990). A court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617. Moreover, "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988)).

## ANALYSIS

Plaintiff has raised four assignments of error: (1) that the ALJ erred in finding that Plaintiff's prior diagnosis of DVT did not meet or equal a listed impairment; (2) that the ALJ erred in failing to consider the full extent of Plaintiff's medical conditions; (3) that the ALJ should have given greater weight to the medical opinions of Plaintiff's treating physicians; and (4) that the ALJ erred in failing to consider Plaintiff's transferability of job skills.

### *Issue No. 1: Whether the ALJ erred in finding that Plaintiff's medical conditions did not meet or equal a listed impairment.*

Plaintiff argues that the ALJ erred in determining that her DVT did not meet or equal Listing

4.11. *See* Brief in Support [12] at 6. In support of her argument, Plaintiff references her May 12,

2010, visit to Forrest General Hospital, where an ultrasound revealed DVT in her right leg. She also

references her May 24, 2010,  admittance to Forrest General, where one doctor noted that Plaintiff

had some swelling in her right leg associated with DVT, and opined that "this will be a long-term

issue and will take quite some time to resolve." ([9] at 217.) Finally, Plaintiff states that she

continued to have a contusion on her right leg until 2012.[21] *See* Brief in Support [12] at 6.

Listing 4.11 addresses the requirements for finding of disabled for DVT, and provides that

a claimant must show:

> Chronic venous insufficiency of a lower extremity with incompetency or obstruction
> of the deep venous system and one of the following:
>
> A. Extensive brawny edema[22] (see 4.00G3) involving at least two-thirds of the leg
> between the ankle and knee or the distal one-third of the lower extremity between the
> ankle and hip. OR
>
> B. Superficial varicosities, statis dermatitis, and either recurrent ulceration or
> persistent ulceration that has not healed following at least 3 months of prescribed
> treatment.

Appendix 1 to Subpart P of Part 404–Listing of Impairments, Listing 4.11.

In order for the Plaintiff to show that her impairment meets or equals a listing, all of the

enumerated criteria must be met. *Sullivan v. Zebley*, 493 U.S. 521, 530. "An impairment that

manifests only some of those criteria, no matter how severely, does not qualify." *Id*. In this case,

---

[21]Plaintiff cites page 513 of the record in support of this assertion; however, there is no
mention of a contusion on that page. The undersigned notes that there is a reference to a
contusion on page 518, but that the record indicates that it was located on Plaintiff's left leg. ([9]
at 518.) Plaintiff's prior DVT was located in her right leg.

[22]Brawny edema is defined as "swelling that is usually dense and feels firm due to the
presence of increased connective tissue." *See* Appendix 1 to Subpart P of Part 404–Listing of
Impairments, Listing 4.00(G)(3).

after a review of the record, the ALJ found that Plaintiff's history of DVT failed to meet or equal Listing 4.11.

As outlined above, this Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings. *Hollis*, 837 F.2d at 1382. A finding of no substantial evidence is appropriate "only if no credible evidentiary choices or medical findings support the decision." *Boyd*, 239 F.3d at 704.

The undersigned finds that the ALJ's determination was supported by substantial evidence, as the record clearly demonstrates that Plaintiff did not fulfill the requirements of Listing 4.11. The records reflects that Plaintiff had a small blood clot in her right leg on March 12, 2010. ([9] at 226-27.) However, since that time, multiple ultrasounds of Plaintiff's right leg have been negative for DVT. In fact, on October 19, 2012, less than one month before the ALJ hearing, Plaintiff had a completely normal ultrasound. ([9] at 502-03.) Moreover, Plaintiff's medical records indicate that she has had no edema in her extremities since her visit to Forrest General on May 24, 2010. On June 8, 2010, Dr. Mark Stevens noted that Plaintiff had no edema in her extremities. ([9] at 344-45.) Likewise, on December 29, 2010, Nurse Jessica Thompson also noted that Plaintiff had no edema. ([9] at 413.) Finally, any mention of superficial varicosities, statis dermatitis, and either recurrent ulceration or persistent ulceration is absent from the record.

For the reasons set forth above, the undersigned finds that the ALJ's decision was supported by substantial evidence. Accordingly, the Commissioner's decision in this regard must be affirmed.

**Issue No. 2: Whether the ALJ failed to consider the full extent of the Plaintiff's medical conditions**.

Next, Plaintiff asserts that the ALJ failed to properly consider her diagnosis of fibromyalgia,

18

chronic mechanical neck and low back pain, arthritis, myofascial pain and right knee pain. *See* Brief in Support [12] at 6. She states that the ALJ failed to "even mention this diagnosis and the symptoms associated [with fibromyalgia]." *Id*. Plaintiff also argues that the ALJ failed to mention the Plaintiff's history of arthritis. *Id*.

The undersigned finds that this argument is without a basis in fact. Contrary to her assertions, the ALJ did in fact consider the various medical conditions cited by the Plaintiff. First, the ALJ referenced Plaintiff's examination with Dr. Weiss in September 2012, and stated, "It was noted that [the Plaintiff] has some hallmark features of fribromyalgia, but there is no record of any testing for this condition." ([9] at 19.) The ALJ also noted that Dr. Weiss was a rheumatologist, meaning that he was physician that specialized in clinical problems involving autoimmune diseases, including arthritis. ([9] at 19.)

Next, the ALJ discussed Plaintiff's neck and back pain extensively throughout his opinion, first outlining Plaintiff's medical records regarding her cervical and lumbar spine, and then ultimately finding that these conditions did not meet or equal a listed impairment ([9] at 15-16; 17-20.) The ALJ noted that Plaintiff's initial CT scan of her cervical spine following her accident was negative for abnormalities. ([9] at 18.) She denied complaints of back pain at an examination one month later on June 8, 2010. ([9] at 18.) On September 14, 2010, Plaintiff had x-rays of her cervical spine that showed degenerative changes at C5–6 and C6-7, but a follow-up MRI dispelled these findings. X-rays of Plaintiff's lumbar spine showed very mild degenerative disc disease at L5-S1. However, there was no loss of disc height and no central or foraminal compromise. ([9] at 19.) On December 29, 2010, Plaintiff had full range of motion of her cervical and lumbar spine, but complained of some pain. ([9] at 19.) On February 22, 2011, in response to her complaints of neck

and back pain, Plaintiff's doctor recommended that she regularly exercise and try to wean herself

off pain medication. ([9] at 19.) In April 2011, an MRI of Plaintiff's thoracic spine showed  some

abnormalities, but her treating physician later opined that it was hard for her to appreciate these

findings, and stated that the MRI was otherwise normal. ([9] at 19.) Examination notes by Plaintiff's

treating physician in June 2011 and January 2012 reflect that Plaintiff had a normal gait and was

able to do straight leg raises, but that she continued to complain of pain. ([9] at 19.)

 After reviewing Plaintiff's medical records, the ALJ set forth the requirements of Section

1.00 of the Appendix 1 Impairments, which concerns impairments of the musculoskeletal system.

([9] at 15-16.) Based on the record, the ALJ concluded that Plaintiff had failed to demonstrate: (1)

any gross anatomical deformity of the joints or limitation of motion with a medical finding of

narrowing, bony destruction or an inability to ambulate effectively (Listing 1.02A); (2) an inability

to perform fine and gross movements effectively (Listing 1.02B); (3) reconstructive surgery or

surgical arthodesis of a major weight-bearing joint with an inability to ambulate effectively ( Listing

1.03); (4) a nerve root compression characterized by neuro-anatomic distribution of pain, limitation

of motion in the spine, motor loss accompanied by sensory or reflex loss and positive straight leg

raising (Listing 1.04A); (5) spinal arachnoiditis (Listing 1.04B); and (6) lumbar spinal stenosis with

pseudo-claudication (Listing 1.04C).

Next, the ALJ specifically discussed Plaintiff's medical history of right knee pain in his

written opinion. He found that while she consistently voiced complaints, every test and examination

of her right knee was unremarkable.  X-rays taken in July 2010 were normal. An MRI taken in

September  2010 was found to be unremarkable. In November 2010, Plaintiff stated that her knee

had improved. In April 2012, Plaintiff has full range of motion in her knee, and in October 2012,

20

she had no knee tenderness. ([9] at 15.)

Finally, the ALJ made note of Plaintiff's general complaints of pain throughout his opinion. After noting that Plaintiff was involved in a vehicular accident in May 8, 2010, the ALJ stated that the Plaintiff "has had residual pain and tenderness since that time." ([9] at 17.)  He repeatedly notes Plaintiff's complaints of pain in her neck, back, right leg, and right knee. ([9] at 17-20.)

This Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence.  *Hollis*, 837 F.2d at 1382. Conclusory allegations that the ALJ failed to consider certain evidence, which are also contradicted by the record, cannot serve as a basis for overturning the Commissioner's decision. Accordingly, the undersigned finds that the Commissioner's decision should be affirmed in this regard.

### Issue No. 3: Whether the ALJ should have given greater weight to the medical opinions of Plaintiff's treating physicians

Plaintiff argues that the ALJ should have given greater weight to the opinions of  Plaintiff's treating physicians Dr. Barbara Barnard and Dr. Kevin Holmes. She claims that both doctors opined as to her functional abilities, and that the ALJ erred in his finding that the opinions were vague and inconsistent. *See* Brief in Support [12] at 6.

A treating physician's opinion on the nature and severity of a patient's impairment must be accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Newton v. Apfel* , 209 F.3d 448, 455 (5th Cir. 2000).  The treating physician's opinions, however, are far from conclusive, as "the ALJ has the sole responsibility for determining the claimant's disability status." *Moore v. Sullivan*, 919 F.2d 901, 905

21

(5th Cir. 1990).  "When good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Good cause exists where statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). A treating physician's diagnoses that is conclusory and "contradicted by both itself and outside medical evidence" cannot serve as a basis to overturn the Commissioner's decision. *Greenspan,* 38 F.3d  at 237-38.

The undersigned finds that the opinions of Dr. Barnard and Dr. Holmes are both conclusory and contracted by other evidence. First, both opinions consist of one-page forms listing several questions, with a small space beside each one for the physician's answer. ([9] at 486; 487.) Dr. Barnard's opinion lists "mild [degenerative disc disease] of the lumber spine" as Plaintiff's principle diagnosis and "thoracic pain [and] low back pain" as a secondary diagnosis. There is no explanation of these findings. Under the heading, "Please list any impairments," Dr. Barnard writes "N/A." Under the heading "Please list this patient's restrictions and reasons for restrictions," Dr. Barnard opined, "No heavy lifting, pulling, pushing, no stooping, kneeling crawling, climbing, twisting, bending, reaching overhead. Worsening pain with any type of activity, walking, standing and prolong[ed] sitting." Again, Dr. Barnard gives no explanation of her opinion. ([9] at 486.)

Likewise, Dr. Holmes's opinion is terse and without elaboration. He lists moderate "lumbago" and moderate "cervicalgia" as Plaintiff's diagnoses. His opinion under the heading "Please list any impairments," consists of one line of writing that is barely illegible, but appears to reference back, neck and knee pain. The measurement tool used to make this assessment is not identified. As for the Plaintiff's restrictions, he writes, "No stooping, lifting or bending." ([9] at

487.)

The record also reflects that other evidence contradicts the doctors' opinions. Dr. Barnard's opinion precluded virtually all physical activity, and Dr. Holmes opinion restricted the Plaintiff from presumably all stooping, lifting, or bending. ([9] at 486; 487.) However, the physical residual functional capacity assessment submitted by Dr. Madena Gibson indicates that while Plaintiff did have some physical limitations, she was still able perform work at a light level of exertion with occasional postural activities. Dr. Gibson found that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently. She also found that Plaintiff could occasionally stoop, kneel, crouch and crawl. She recommended that Plaintiff limit her exposure to workplace hazards. Dr. Gibson supported these findings by referencing Plaintiff's neck and back injury, as well as her DVT, but also noting that Plaintiff had a steady stance and gait and no edema. ([9] at 357-64.)

Plaintiff's testimony at the hearing also contradicts Dr. Barnard's opinion. For instance, Dr. Barnard opined that Plaintiff should not reach overhead, yet at the hearing, Plaintiff testified that she was able to regularly reach over her head in order to style her hair. Plaintiff also testified that she was able to prepare meals, do laundry, perform light housework and take walks around her yard. ([9] at 48-51). These activities do not comport with an individual with the restrictions opined by Dr. Barnard.

Finally, Dr. Barnard's and Dr. Holmes's own treatment notes contradict their opinions. Dr. Barnard characterized Plaintiff's back condition as mild and improved with medication, yet her opinion regarding the Plaintiff's limitations essentially restricted the Plaintiff from any kind of physical exertion. Furthermore, she had also opined at an earlier appointment that an MRI of Plaintiff's neck was "completely normal," and that Plaintiff denied any back pain. Dr. Barnard even

23

recommended that Plaintiff exercise regularly and attempt to get off her pain medication. ([9] at 389-90.) Likewise, Dr. Holmes had earlier stated that Plaintiff's condition only "moderately" limited her activities. He also recommended that the Plaintiff engage in light exercise.  ([9] at 497-99.)

The ALJ found that both doctors' opinions were "unclear and rather vague," and that "significant weight cannot be afforded to the opinions due to the fact that they are somewhat inconsistent, vague, and inconsistent with the overall evidence and with the treatment notes from the physicians." The undersigned finds that the record supports this interpretation, and that in any event, the ALJ's decision was supported by substantial evidence.

The ALJ supported his decision by considering not only Plaintiff's medical records, but also her testimony at the hearing. Regarding the Plaintiff's medical records, the ALJ stated that "the claimant's objective testing have all been mild or normal and the only objective findings have been that of tenderness and pain." ([9] at 20.) The ALJ also found that "[a] review of the record reflects no limitations in activities of daily living greater than those . . . reflected in the residual functional capacity." At the hearing, Plaintiff testified that she is able to prepare meals, do laundry and light housework, and visit her sister a few blocks away on a regular basis. She further testified that she was able to do two or three laps around her yard per day. ([9] at 48-51.)

For the reasons set forth above, the undersigned finds that the ALJ's decision was supported by substantial evidence. Accordingly, the Commissioner's decision in this regard must be affirmed.[23]

_____

[23]Although Plaintiff does not raise this argument in her Complaint or Brief in Support, the ALJ was not obligated to perform a detailed analysis of the criteria set forth in 20 C.F.R. § 404.1527(d) *See also Qualls v. Astrue*, 339 F. App'x 461, 466 (5th Cir. 2009); *Myers v. Astrue*, No. 5:09cv121–DCB– JMR, 2010 WL 6397551, at *12 (S.D. Miss. Nov. 18, 2010) (holding that "the ALJ's obligation to perform a detailed analysis of [the treating physicians'] views, under the criteria set forth in 20 C.F.R. 404.1527(d), was not triggered because reliable medical evidence from treating or examining physicians, which controverted their opinions, is reflected in the

### Issue No. 4: Whether the ALJ erred in failing to consider Plaintiff's lack of transferable job skills

Finally, Plaintiff argues that the ALJ erred in failing to consider her transferability of job skills. She argues that because the ALJ found that she could not return to her past work, he was required to consider her transferable skills in determining whether she was disabled. *See* Brief in Support [12] at 7-8.

At step four, the ALJ determined that Plaintiff had past relevant work experience as a teacher's aid, wire harness assembler, and an order sorter. He also determined that Plaintiff had a high school education and was able to communicate in English. The vocational expert testified that a hypothetical individual with the same age, education, experience and RFC as that described for the Plaintiff could not return to the performance of her past jobs. On this basis, the ALF found that Plaintiff was unable to perform any past relevant work. ([9] at 21.) He then found at step five that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills." ([9] at 21.)

The undersigned finds that the Plaintiff's argument regarding the transferability of job skills is misplaced. At step five, the Commissioner has the burden to show that a claimant's RFC, age, education and work experience allow her to perform work in the national economy. *See* 20 C.F.R. § 404.1520(f). The Commissioner may satisfy this burden of proof by referring to the Medical-Vocational Guidelines of Appendix 2 of the regulations. *Heckler v. Campbell*, 461 U.S. 458, 470

---

record") (Report and Recommendation adopted by *Myers v. Astrue*, No.
5:09CV121-DCB-RHW, 2011 WL 1213089 (S.D. Miss. Mar 30, 2011)).

(1983). Pursuant to 20 C.F.R.§ 404.1563[24] and Part 404, Supt. P, App. 2, Rule 202.21, a claimant aged 18-49 with a high school education and the capacity for light work is deemed not disabled regardless of whether the individual has transferable skills.

Plaintiff was forty years old on her alleged disability onset date and has a high school education. ([9] at 138.) The ALJ found at step four that she had the RFC to perform light work[25] as defined in 20 C.F.R. § 404.1567(b), except she requires a sit/stand option. ([9] at 16.) Thus, under the relevant Medical-Vocation Guidelines, Plaintiff is not disabled regardless of the transferability of job skills. *See Burton v. Social Sec. Admin.*, Civil Action No. 13-661, 2014 WL 775616, at *12 (E.D. La. Feb. 25, 2014) ("As the ALJ stated, transferability of skills is not an issue under the framework of the Medical-Vocational Guidelines for a younger individual who has the residual functional capacity to perform light work."). Accordingly, the undersigned finds that the Commissioner's decision should be affirmed on this basis.

## CONCLUSIONS AND RECOMMENDATIONS

Based on the foregoing, the undersigned finds that the Commissioner's decision is supported by substantial evidence and utilizes correct legal standards. Therefore, the undersigned recommends that Defendant's Motion to Affirm the Commissioner's Decision [14] be GRANTED, and that the Complaint [1] be dismissed and the denial of benefits be affirmed.

---

[24]Section 404. 1563 provides "If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work."

[25]The ALJ noted that Plaintiff's ability to perform all or substantially all of the requirements of this work level was impeded by additional limitations. However, through a line of hypothetical questioning with the vocational expert, the ALJ later found that Plaintiff's additional limitations did not completely erode her ability to perform unskilled light work. ([9] at 21-22.)

26

**<u>NOTICE OF RIGHT TO OBJECT</u>**

In accordance with the rules, any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the Judge, the Magistrate Judge and the opposing party.  The District Judge at the time may accept, reject, or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this court with instructions.  The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

THIS the 3rd day of June, 2015.

s/ Michael T. Parker
United States Magistrate
